Dewey MAGAR *v.* STATE of Arkansas

CR 91-277                                    826 S.W.2d 221

Supreme Court of Arkansas
Opinion delivered February 24, 1992

*Art Allen*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Pamela Rumpz*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. On October 1, 1990, the appellant, Dewey Magar, was convicted of three counts of sexual abuse in the first degree and sentenced to three years for the first count and five years apiece for the remaining two counts, all sentences to run concurrently.

Magar asserts three points of error on appeal: 1) the trial court erred in denying his motion to suppress religiously privileged testimony under Ark. R. Evid. 505, 2) the trial court erred in denying his motion for a directed verdict in that the State's evidence was insufficient to sustain his convictions, 3) the trial court erred in denying his motion for a mistrial after a witness for the State referred to prior uncharged conduct relating to him in violation of the trial court's order to refrain from such prejudicial commentary. None of these arguments has merit, and we affirm the judgment of the trial court.

Magar initially claims that the trial court erred in denying his motion to suppress religiously privileged testimony under Ark. R. Evid. 505. Prior to trial, Magar filed a motion to suppress testimony of Reverend John Rowe on the basis that the testimony was privileged under Rule 505, which provides as follows:

(a) Definitions. As used in this rule:

(1) A "clergyman" is a minister, priest, rabbi, accredited Christian Science Practitioner, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.

(2) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.

(b) General Rule of Privilege. A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.

(c) Who May Claim the Privilege. The privilege may be claimed by the person, by his guardian or conservator, or by his personal representative if he is deceased. The person

who was the clergyman at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the communicant.

In reviewing a trial court's ruling on a motion to suppress, we make an independent determination based on the totality of the circumstances and reverse only if the trial court's ruling was clearly against the preponderance of the evidence. *Cook* v. *State*, 293 Ark. 103, 732 S.W.2d 462 (1987).

Magar was charged with sexual abuse in the first degree of three boys who were under the age of fourteen. At the hearing on the motion to suppress, Magar stated that the conversation at issue was made in confidence on the basis that he and Reverend Rowe had had many counseling sessions during the course of their time spent together at church and Reverend Rowe had assured him that their conversations were private. In essence, he acted in reliance on a purported established relationship of confidentiality between himself and Reverend Rowe when he discussed the issues later involved at his trial.

Reverend Rowe testified that he was the pastor at New Life Christian Fellowship, where the victims, their families, and Magar were members. He also related that after the parents of two of the boys told him that their sons had been sexually abused by Magar, he went to the church where Magar was involved in a music ministry practice, interrupted the music practice, and asked Magar to step into his office. He then confronted Magar with the allegations, whereupon Magar admitted that they were true.

Reverend Rowe also testified regarding the doctrines of his church: confession is not a tenet of his church and keeping evidence of a crime confidential is within the discretion of the pastor. His own practice was to keep confidential that information gained in a counseling relationship. Although he had had counseling sessions with Magar on prior occasions, he had not counseled with Magar for several months before the conversation at issue and considered this particular conversation "disciplinary in nature." Further, Reverend Rowe did not tell Magar that the conversation was confidential, nor did Magar ask that it be kept confidential.

We initially note that Magar's reliance on *State* v. *Sypult*, 304 Ark. 5, 800 S.W.2d 402 (1990), is misplaced in that we stated in that case that when conflicts arise between the rules established by the court and legislation enacted by the General Assembly, the court will defer to the General Assembly only to the extent that the conflicting court rule's primary purpose and effectiveness are not compromised; otherwise, the court rules remain supreme. There simply is no similar conflict here with regard to Rule 505.

We find it significant, in this case, that Reverend Rowe sought out Magar to confront him with the allegations of sexual abuse conveyed to him by the parents of two of the victims. Although Reverend Rowe had counseled with Magar on previous occasions, the last occasion being several months before the conversation at issue, Reverend Rowe did not consider this to be a counseling session at all, but disciplinary in nature. The attendant circumstances support the trial court's decision that this was an accusatory situation initiated by Reverend Rowe that did not encompass spiritual counseling, thereby precluding Magar from excluding Reverend Rowe's testimony at trial.

Other courts have considered the privilege of religious communications and determined the applicability of the privilege on the facts of each case. Illustrative of the rationale denying the privilege are *United States* v. *Gordon*, 493 F.Supp. 822 (N.D. New York 1980) (citing *Trammel* v. *United States*, 445 U.S. 40 (1980))(it was emphasized that the privilege between priest and penitent is limited to private communications, a privilege recognizing "the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return," which facts and circumstances were not present where the challenged conversations related to business matters), and *Burger* v. *State*, 231 S.E.2d 769 (Ga. 1977)(the ministerial privilege was not applicable to testimony of reverend, as witness for the state in a homicide prosecution, relating to conversational statements made to him by the defendant regarding the defendant's intent to kill his wife where the record showed that the statements by the defendant to which the witness testified were not made by the defendant in professing religious faith or seeking spiritual comfort or guidance).

In comparison, the privilege was upheld in *People* v. *Reyes*, 545 N.Y.S.2d 653 (Supp. 1989), where a conversation between a priest and the defendant was a privileged communication, which the priest could not testify about before a grand jury, where the defendant was seeking some type of spiritual advice from the priest with the reasonable expectation that the conversation would be kept secret when the defendant went to the priest's church after a shooting.

■ In contrast to *People* v. *Reyes, supra*, Magar's communication was not made to Reverend Rowe in his professional character as a spiritual adviser and, given the circumstances of this case, we are unable to say that the trial court's denial of Magar's motion to suppress was clearly against the preponderance of the evidence.

Next, Magar claims that the trial court erred in denying his motion for a directed verdict in that the State's evidence was insufficient to sustain his convictions.

In *Hodge* v. *State*, 303 Ark. 375, 796 S.W.2d 347 (1990), we noted that in criminal cases on appeal where the appellant challenges the sufficiency of the evidence, we will affirm the trial court's decision if there is substantial evidence to support the findings. Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture.

Arkansas Code Ann. § 5-14-108 (1987) addresses sexual abuse in the first degree and provides in pertinent part that "(a) A person commits sexual abuse in the first degree if: . . . (3) Being eighteen (18) years old or older, he engages in sexual contact with a person not his spouse who is less than fourteen (14) years old." Sexual contact is defined in Ark. Code Ann. § 5-14-101 (1987) as ". . . any act of sexual gratification involving the touch, directly or through clothing, of the sex organs, or buttocks, or anus of a person . . . ."

In this case, the first victim told the jury that Magar had invited him to his house to look at Boy Scout uniforms. They went into Magar's bedroom to try on the uniforms, where Magar touched him "on the genitals through his clothing." The victim further testified as follows:

Q   Okay. Good. Tell me about Mr. Magar offering to help you with your Boy Scout uniform.

A   . . . And we started trying on some of the pants. And when I was trying to fasten my pants he would always try to help me zip them and button them and every time I'd say I didn't need any help. And then after that he would feel around the crotch area seeing if it was too big. And one time he touched me on the genitals, but each time he'd try to do it real fast. So I wouldn't suspect anything. After, after I tried on some pants I was sitting in my shirt and underwear and he came over to me and said, "I like your underwear. Where did you get them?" I said, "My mom got them for me." He said, "I still like them." And around then I didn't feel very comfortable at that point. Then we started trying on some of the shirts and each time he tried to help me button them and each time I told him I didn't need any help.

*       *       *       *

Q   Are you telling this jury that Dewey Magar touched you on the penis?

A   Yes, ma'am.

Q   Do you, do you know how many times he touched you that day?

A   No. At the least, two times.

Q   How many times did he touch you after you told him that you could try, you could put these pants on by yourself?

A   At least two, at least two times.

The second victim testified that he, his brother, and Magar were watching movies in the victim's family's den. Magar sat next to the victim and began rubbing the victim's leg, after which he put his hand on the victim's penis and began rubbing and playing with it.

The third victim testified that, while he and Magar were in the sound room of their church, Magar began rubbing his leg and stuck his hand inside his pants. The victim related that Magar

touched his penis and had said that he could touch Magar's penis if he wanted to. Magar then told the victim to keep this a secret and not to tell anyone.

■ In sum, each victim testified that Magar had touched his genitals, either directly or through his clothing. We find this evidence to be substantial in support of Magar's convictions.

Finally, Magar contends that the trial court erred in denying his motion for a mistrial when a witness for the State referred to prior uncharged conduct relating to him in violation of the trial court's order to refrain from such prejudicial commentary.

■ A mistrial is an extreme and drastic remedy that should be resorted to only when there has been an error so prejudicial that justice could not be served by continuing the trial. The granting or denial of a motion for mistrial lies within the sound discretion of the trial judge and the exercise of that discretion should not be disturbed on appeal unless an abuse of discretion is shown. *Russell* v. *State*, 306 Ark. 436, 815 S.W.2d 929 (1991).

Magar refers to the following exchange between the deputy prosecutor and the third victim who testified:

Q   Timothy, did you tell anyone?

A   No, not 'till a few weeks later.

Q   What caused you to tell someone a few weeks later?

A   Well, my brother, he told me —

Q   Who's your brother?

A   Daniel. And he said, "Did Dewey molest some children —"

Q   (Interposing) Okay. He told you —

MR. ALLEN: [Defense counsel]: Your Honor —

THE COURT: Counsel approach the bench.

■ Magar claims that the victim's comment was highly prejudicial and potentially inflammatory in that it implied that there were prior unadjudicated instances of child molestation; however, during the sidebar discussion among the parties' counsel and the trial court, defense counsel agreed with the trial court

that a ten minute break and an admonishment would suffice to remedy any potential prejudice resulting from the victim's comment. Consequently, Magar cannot now assert prejudice, *see* *Matthews* v. *State*, 305 Ark. 207, 807 S.W.2d 29 (1991), and the trial court did not abuse its discretion.

Affirmed.

DUDLEY and NEWBERN, JJ., dissent.

DAVID NEWBERN, Justice, dissenting. According to Arkansas Rules of Evidence 505(b), the "religious" privilege clearly belongs to the "person" (Dewey Magar), and not to the clergyman (Reverend Rowe), to whom statements were made in confidence. The majority opinion seems not to question that point but focuses on whether the statement in this case can be said to have been "confidential." Yet in the process of considering that question the opinion dwells on Rowe's expectations rather than those of Magar. Therein lies the mistake.

According to Rule 505(a)(2), a statement is confidential "if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication." The entire relationship between Reverend Rowe and his Church and Magar came about due to Magar's felt need for counseling with respect to his sexual inclinations. Reverend Rowe testified he had informed Magar that what Magar said to him in their counseling sessions would not be disclosed, and it is undisputed that Rowe had not informed Magar he felt the counseling sessions had ended. While apparently the counseling sessions had been more frequent when they began, they continued every few months.

The majority opinion concludes that, because Rowe called Magar to his office in a "confrontational" manner, Rowe had stepped out of what Rule 505(b) calls "his professional character as spiritual adviser." Why? Suppose that when Rowe interrupted choir practice to call Magar to his office Magar had every reason to expect a "confrontation." Does that mean Magar had reason to expect what he said to his confessor, who had counseled him on the very type of problem about which he then asked, would not honor the relationship and the promise of confidentiality? The majority opinion gives utterly no reason for concluding so. Again,

the problem with the majority opinion is that it deals with Rowe's expectations rather than those of Magar, and it is Magar's expectations that count under the Rule.

The majority cites cases for a "rationale" for denying the privilege along with a case in which the privilege was upheld. The reader is asked to credit *United States* v. *Gordon*, 493 F. Supp. 822 (N.D. New York 1980), and *Burger* v. *State*, 231 S.E.2d 769 (Ga. 1977), in support of the "rationale" of the majority opinion. The cases are not even relevant.

*United States* v. *Gordon* involved a series of communications between Gordon and Father Meyers, a salaried executive in one of Gordon's companies. These communications related purely to the business and consisted of messages Gordon asked Meyers to relay to a business acquaintance. Gordon knew Meyers was on leave of absence from the priesthood and specifically intended that the information go from the priest to another person. To say that the "rationale" of the decision that there was no privilege in such a case should influence us here is, to say the least, unfortunately illogical.

*Burger* v. *State* involved conversational statements that Burger intended to kill his wife and her lover made to a clergyman characterized by the Court as a "friend and frequent companion." Not only was there no showing of a counseling or confidential relationship, there was not even an objection to the testimony at Burgers' trial. The failure to object was obviously for good reason. Such an objection would have been an indication of no knowledge of the law. I find it almost as egregious to cite the case here.

Even if those cases were not so easily distinguished, or if there were the slightest evidence to support the conclusion that Rowe's "confrontational" manner in some way should have informed Magar that this session was different from the others, there are important considerations with respect to the Arkansas codification of the privilege which require a result contrary to that reached by the majority.

Arkansas Rules of Evidence 505(2)(c) states the privilege may be claimed by the person or communicant, and that a presumption exists that the privilege may be claimed by the

clergyman only on behalf of the communicant. Subsection (2)(b) provides that the person or communicant has the privilege to prevent the clergyman from disclosing a confidential communication. This language makes it clear that the privilege is controlled by the communicant alone. This language was not used accidentally and manifests a clear preference on the part of the drafters. Note, *Developments In the Law — Privileged Communications*, 98 Harv. L. Rev. 1450, 1556 (1985), points out that some states grant the priest-penitent privilege to the clergy as well as to the communicant, citing the Alabama and California codifications. Other states provide that neither the priest nor the penitent may waive the privilege, notably, the Indiana, Michigan, Vermont, and Wyoming codifications. Still others provide that the privilege belongs to the clergy and the communicant has no standing to object to the testimony of the clergyman. Nothing in our Rule or the facts of this case supports the Court's conclusion that intent or actions of the clergyman may dictate that which is or is not a confidential communication. Our codification of the privilege is substantially identical to our physician-psychotherapist privilege which is clearly controlled by the client or the patient alone.

The policy considerations underlying the privilege were clearly enunciated in *Trammel* v. *United States*, 445 U.S. 40, 51 (1979), as follows:

> The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.

The majority opinion contradicts these considerations, apparently holding there can be no confidence in communications with a clergy person unless he or she decides the matter is one which warrants privacy. This conclusion is intolerable in view of the language of the Rule, the policy underlying it, and the facts of this case.

I respectfully dissent.

DUDLEY, J., joins in this dissent.